# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# NEW ALBANY DIVISION

| | |
|---|---|
| RAYMOND LILLY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:17-cv-00010-TWP-DML ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND RULING FOLLOWING BENCH TRIAL

This matter is before the Court following a bench trial on Plaintiff Raymond Lilly's ("Mr. Lilly") claim for negligence against Defendant United States of America ("United States" or "Defendant"). On January 13, 2017, Mr. Lilly filed a Complaint asserting one count of negligence because of a serious personal injury he sustained while delivering mail packages to the United State Post Office in Lawrenceburg, Indiana (the "Post Office"). Following the United States' admission of liability, this matter proceeded to a bench trial in August 2019 on the issue of damages. The Court, having heard testimony and received evidence, now issues the following findings of fact and conclusions of law and ruling.

## I. FINDINGS OF FACT

In approximately 2000, Mr. Lilly owned a business and was a commercial truck driver, but he lost his commercial driver's license because he was diabetic (Filing No. 105 at 11–12). Around 2002, because of the loss of his commercial driver's license, Mr. Lilly's trucking company went out of business, which led to the loss of his income. *Id.* at 14–15. Years earlier, Mr. Lilly had attended high school in Cincinnati, Ohio, but he did not complete high school or obtain his GED (General Equivalency Degree). Mr. Lilly did, however, receive vocational training in auto

mechanics and welding. He worked as a mechanic for a handful of years following his time in high school. *Id.* at 7–8. Then he began driving trucks. Mr. Lilly's employment and skillset were truck driving for approximately twenty-five years.

After his trucking company went out of business, Mr. Lilly did not work from 2000 until he returned to the workforce in October 2013. He worried all the time and did not take care of his health. (Filing No. 105 at 15). He received social security disability during that time and his disability benefits converted to retirement benefits in 2013 when he turned 65. (Filing No. 104 at 19 and 217). In 2009, Mr. Lilly decided that he was going to get his life back in order and he started exercising, eating right, taking his medications and lost approximately 80 pounds. (Filing No. 105 at 15-17). In March or April 2013 he passed a DOT physical to become a truck driver once again. *Id*. at 18-19.

Mr. Lilly began a job as a truck driver for Joe Poff, Inc., delivering packages for Amazon in October 2013. During his employment with Joe Poff, Inc., he was responsible for making deliveries to five United States Postal Service ("USPS") facilities in Indiana and Ohio. He drove a twenty-six-foot box truck approximately seventy-eight miles from roughly 3:30 a.m. to 8:00 a.m. on each day that he worked. *Id.*

At approximately 4:00 a.m. on December 24, 2013, Mr. Lilly arrived at the Lawrenceburg Post Office, which was the first stop on his delivery route. He backed his truck into the loading dock area and rang the bell to alert the USPS employee inside the Post Office that he had arrived. USPS employee, Gerald Bergfeld ("Mr. Bergfeld"), came outside to help Mr. Lilly unload his truck. Mr. Bergfeld and Mr. Lilly connected the dock plate to the rear of Mr. Lilly's truck. A dock plate is a metal plate that bridges the gap between a truck and the loading dock. The loading dock also has a spring-operated dock plate. *Id.* at 2–3.

Mr. Lilly unloaded his truck, completed the necessary paperwork, and returned his pallet jack to the rear of his truck. He then exited the rear of his truck by walking onto the dock plate. Before Mr. Lilly had completely cleared the dock plate, Mr. Bergfeld, without looking, pulled the chain to release the dock plate. The dock plate raised up quickly, which caused Mr. Lilly to fall off of the loading dock and onto the ground below. Mr. Bergfeld saw Mr. Lilly fall backwards four to five feet off of the dock. *Id.* at 3–4. Mr. Lilly was initially unable to get up on his own, so Mr. Bergfeld helped him get up off of the ground ([Filing No. 104 at 33](Filing No. 104 at 33)). Mr. Bergfeld assisted him up the stairs back onto the dock to sit in a chair. Mr. Lilly needed help getting back up the stairs because he was dazed from the impact of his fall ([Filing No. 105 at 42](Filing No. 105 at 42)–43). Mr. Bergfeld offered Mr. Lilly medical attention after the fall, but Mr. Lilly declined. Mr. Bergfeld informed his supervisor about Mr. Lilly's fall the morning of the incident ([Filing No. 104 at 47](Filing No. 104 at 47)). However, Mr. Lilly's injury was never reported to, or investigated by, the Occupational Safety and Health Administration ([Filing No. 84 at 5](Filing No. 84 at 5)).

Mr. Bergfeld had never received any formal training regarding the operation of the dock plate. He never reviewed or had access to the operating manual for the dock plate. In fact, Mr. Bergfeld was unaware of the type of dock plate or the mechanism by which the dock plate operated, and he was unaware of any policies or procedures in place regarding operating the dock plate. At the time of the accident, the Post Office did not have any formal procedures for assisting third-party drivers like Mr. Lilly with the dock plate. *Id.* at 4.

USPS does not have any documentation that maintenance was performed by the USPS maintenance staff on the dock plate during the three years leading up to December 24, 2013. USPS previously had received reports about the dock plate malfunctioning such as failing to properly raise and lower, having the chain stick, and requiring extra weight to lock the dock plate into

3

position. In fact, in the past, Mr. Bergfeld had the dock plate fail to properly raise and lower, had the dock plate's chain stick, and had the dock plate require extra weight to lock it into position. However, Mr. Bergfeld did not personally report these dock plate problems to anyone ([Filing No. 84 at 3](#)–4).

The USPS Operations Manager, Scott Compton ("Mr. Compton"), acknowledged that the dock plate should have been "red tagged" after the incident and that an investigation should have been completed to determine if the dock plate malfunctioned. However, there is no evidence that the dock plate was red tagged or inspected after the incident. Mr. Compton was told that the dock plate was operating correctly at the time of the incident, so he took no further action. *Id.* at 5.

The USPS Maintenance Manager, Manitou Helton ("Mr. Helton"), acknowledged that USPS employees did not work on spring-operated dock plates because of a lack of proper equipment and safety concerns associated with servicing such dock plates. He was unaware of anyone at USPS red tagging or inspecting the Post Office dock plate after the incident, so he took no further action. Mr. Helton further acknowledged that an individual falling off of a dock lift resulting in injury is an emergency that should be reported, but he was not contacted following Mr. Lilly's incident, so he did not inspect the dock plate or take any other action concerning the dock plate. Even though the manufacturer of the dock plate recommended maintenance, inspection, and lubrication at least every thirty days, Mr. Helton conceded that the USPS maintenance department does not do routine preventative maintenance on dock plates. He also was unaware of any contractor doing routine preventative maintenance on the dock plate. *Id.*

The fall from the loading dock on December 24, 2013, resulted in Mr. Lilly sustaining two spinal fractures (a right C7 facet fracture and a compression fracture of the T4 vertebral body), a mild traumatic brain injury, and post-concussive syndrome. He sought medical treatment at the

Dearborn County Hospital in Lawrenceburg, Indiana, on December 26, 2013, where he was diagnosed with a nondisplaced fracture of the right C7 facet, a compression fracture of the T4 vertebral body, a concussion, a possible stroke, and loss of glycemic control. On December 27, 2013, Mr. Lilly was transferred to the University of Cincinnati Hospital for additional medical treatment, where he was admitted to the hospital for four days. He was discharged to return home on December 30, 2013. *Id.* at 6.

In addition to the spinal fractures, the concussion, and the post-concussive syndrome, the fall from the loading dock on December 24, 2013, also caused an exacerbation of Mr. Lilly's pre-existing diabetes, neuropathy, hypertension, and hyperlipidemia; short-term memory loss; hypogonadism; psychological trauma, including depression and anxiety; renal failure; weight gain; and chronic pain (Filing No. 104 at 242–48, 251–52, 257–59, 265–67, 275).

Mr. Lilly continued receiving follow-up medical care with the neurosurgical and pain management team at Mayfield Clinic until 2017. He also has been seen on a monthly basis by his primary care physician, Dr. Harold T. Pretorius ("Dr. Pretorius"). Mr. Lilly incurred a total of $59,483.03 in medical bills as a result of the injuries he sustained (Filing No. 84 at 6–7).

While at Dearborn Hospital, Mr. Lilly was given a neck brace, which he had to wear for more than a month after the accident, and which he still has to use on occasion to alleviate his severe pain (Filing No. 105 at 50–51). Mr. Lilly has not worked since his fall on December 24, 2013. Dr. Alson Lee Greiner ("Dr. Greiner"), from the Mayfield Clinic, opined during office visits on March 31 and May 16, 2014, that Mr. Lilly was disabled from his work as a truck driver. Dr. Greiner further opined on August 28, 2014, that Mr. Lilly was totally disabled from work (Filing No. 84 at 6–7).

At trial, the United States' expert witness, Dr. Ryan Gleason ("Dr. Gleason"), opined that Mr. Lilly's injuries from the fall (the C7 facet fracture, the T4 compression fracture, and the concussion) were not permanent conditions and did not render Mr. Lilly totally disabled (Filing No. 104 at 108, 114, 117). Dr. Gleason testified that he has had some patients with these same injuries who were able to return to work. *Id.* at 162–63. The Court notes that the parties stipulated, "The United States' expert, Dr. Ryan Gleason, does not dispute that Mr. Lilly is unable to work and has complaints of daily pain." (Filing No. 84 at 7.)

Dr. Gleason also testified that most individuals with an incomplete C7 facet fracture recover over a period of a couple months, and most individuals with a T4 compression fracture recover over the course of a couple weeks though some people may have lingering pain that can last a couple months (Filing No. 104 at 80, 82–83). Dr. Gleason noted that a follow-up MRI from July 2015 indicated that Mr. Lilly's spinal fractures had healed, and there was no injury to Mr. Lilly's spinal cord. *Id.* at 91–92. While Dr. Pretorius (Mr. Lilly's primary care physician) agreed that the accident on December 24, 2013, did not cause damage to Mr. Lilly's spinal cord, he testified that the compression fracture does not fully heal because a patient will still have a loss of height in that vertebra. *Id.* at 307.

Dr. Gleason testified that most individuals who sustain a mild traumatic brain injury recover completely, and most symptoms completely resolve within a few months. He further opined that Mr. Lilly's diabetes and hypertension were not rendered permanently out of control because of the accident, and Mr. Lilly had a history of these conditions before the accident. Dr. Gleason acknowledged that a person with pre-existing psychological conditions, such as anxiety and depression, could have a recurrence of those symptoms and conditions following a trauma like Mr. Lilly's fall. *Id.* at 97, 99, 104, 168–69.

6

Dr. Pretorius testified that separate and apart from his fall in December 2013, Mr. Lilly had multiple risk factor for a stroke including diabetes, hypertension, hyperlipidemia, congestive heart failure, and renal failure. ([Filing No. 104 at 318-319](#)). Mr. Lilly also had chronic kidney disease bordering at state 4 related to his diabetes. *Id*. at 316. Dr. Pretorius testified that, as a result of the accident, Mr. Lilly's blood pressure and glucose levels increased as his conditions were exacerbated by the fall. *Id.* at 242–43. He opined that, in addition to the spinal fractures, mild traumatic brain injury, recurrent stroke symptoms, and post-concussive syndrome, Mr. Lilly also developed hypogonadism, psychological trauma, depression, increased anxiety, progressive renal failure, and increased risk of heart failure as a result of the accident. *Id.* at 257–59, 288–90. Dr. Pretorius opined that, as a result of Mr. Lilly's mild traumatic brain injury from the accident, he suffered cognitive impairment and short-term memory loss. The post-concussive syndrome that Mr. Lilly suffered also caused headaches, memory loss, inability to concentrate or focus, and hormonal abnormalities ([Filing No. 104 at 259](#)–63).

Dr. Pretorius further opined that Mr. Lilly is permanently disabled, yet he acknowledged that the accident was not the only cause of Mr. Lilly's disability. *Id.* at 268, 271, 310. Dr. Pretorius also acknowledged that, prior to the accident in December 2013, Mr. Lilly had periods where his diabetes was under control and periods where his diabetes was uncontrolled. The periods when Mr. Lilly's diabetes was uncontrolled was generally the result of Mr. Lilly failing to follow medical advice. *Id.* at 294.

At the time he resumed work with Joe Poff, Inc., Mr. Lilly was 65 years old. At the time of his trial he was seventy-one years old ([Filing No. 84 at 1](#)). Dr. Pretorius testified during trial of his opinion that Mr. Lilly had a reduced life expectancy to the age range of 78 to 82 years old. *Id.*

7

at 274. However, Dr. Pretorius' initial opinion regarding Mr. Lilly's life expectancy was three to five years, or to the age range of 70 to 72 years old. *Id.* at 273; Trial Ex. 21.

Concerning Mr. Lilly's ongoing medical treatment, Dr. Pretorius explained, in order to manage the residual effects of the spinal fractures, Mr. Lilly requires chronic pain medication and monthly check-ups. Because Mr. Lilly's pain has failed to improve, it is likely that he will continue to experience the same pain ([Filing No. 104 at 258](), 275). If Mr. Lilly does not take his pain medication, his pain is a ten out of ten ([Filing No. 105 at 61]()).

Dr. Pretorius opined that Mr. Lilly will require continuing medical care including monthly appointments for pain management, care for renal failure, and treatment for the exacerbation of his diabetes. His medications could cost approximately $2,000.00 per month. Dr. Pretorius opined Mr. Lilly may need dialysis in the next year or two to treat renal failure, which might cost $80,000.00 per year ([Filing No. 104 at 277]()–79, 290). Dr. Pretorius further opined Mr. Lilly likely will end up in a skilled nursing care facility for the last year or two of his life. *Id.* at 277–78; Trial Ex. 21.

As a neurologist, Dr. Gleason, testified that he routinely encounters patients with peripheral diabetic neuropathy. ([Filing No. 104 at 87-88]()). Dr. Gleason opined that if Mr. Lilly had not been injured on December 24, 2013, Mr. Lilly's diabetic amyotrophy and peripheral neuropathy and the port reflexes would have effected his ability to feel his feet while driving. ([Filing No. 104 at 109-110]()). He opined Mr. Lilly would not be able to work as a truck driver with this condition for more than "a couple of years more." *Id*.

Mr. Lilly worked for Joe Poff, Inc., for approximately six weeks before the accident. In the weeks leading up to the accident, he was paid the following amounts by Joe Poff, Inc. for his truck driving work: $900.00 for October 8–17, 2013; $900.00 for November 8–14, 2013; $1,300.00 for

November 15–21, 2013; $1,100.00 for November 22–28, 2013; $1,250.00 for November 29–December 5, 2013; $900.00 for December 7–12, 2013; $1,300.00 for December 13–19, 2013; and $750.00 for December 20–26, 2013 (Filing No. 84 at 2).  From the time that Mr. Lilly began working for Joe Poff, Inc. in October 2013 until the time of the accident, he earned a total of $8,500.00 or average weekly wages of $1,050.00.

## II. CONCLUSIONS OF LAW

The Federal Tort Claims Act provides that a plaintiff cannot file suit against the United States for money damages for personal injury until the plaintiff has presented the claim to the appropriate federal agency and the claim has been denied or has been deemed denied after the six-month adjudicatory period expires.  28 U.S.C. § 2675(a); *Zurba v. United States*, 318 F.3d 736, 738 (7th Cir. 2003).

In accordance with the Federal Tort Claims Act, on November 13, 2015, Mr. Lilly, represented by counsel, filed a federal tort claim with USPS, seeking $500,000.00 in damages for his injuries (Filing No. 84 at 7).  On July 21, 2016, USPS denied Mr. Lilly's tort claim.  Thereafter, Mr. Lilly timely filed this suit on January 13, 2017.  *Id.* On June 12, 2019, this Court granted Mr. Lilly's motion to increase his claim under the Federal Tort Claims Act, thereby removing the $500,000.00 statutory cap to damages because of "newly discovered evidence" or "intervening facts" concerning Mr. Lilly's anxiety and depression (Filing No. 94 at 6–7).

Mr. Lilly has asserted a single claim of negligence against the United States.  "The essential elements for a negligence action are '(1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty.'" *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515 (Ind. 2014) (quoting *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011)).

The parties have stipulated:

> On December 24, 2013, USPS owed Mr. Lilly a duty of care.
>
> USPS was responsible for taking reasonable care in inspecting, operating, and maintaining the dock plate at the Post Office.
>
> USPS breached the duty it owed to Mr. Lilly on December 24, 2013, which caused Mr. Lilly to fall from the loading dock. Mr. Lilly sustained 2 spinal fractures (a right C7 facet fracture and a compression fracture of the T4 vertebral body), a mild traumatic brain injury, and post-concussive syndrome, which were all proximately caused by his fall on December 24, 2013.

([Filing No. 84 at 6](#) (paragraph numbers omitted).) Therefore, the elements of Mr. Lilly's negligence claim are met.

Additionally, in Indiana, "a tortfeasor takes the injured person as he finds her, and the tortfeasor is not relieved from liability merely because an injured party's pre-existing physical condition makes him or her more susceptible to injury." *Bolin v. Wingert*, 764 N.E.2d 201, 207 (Ind. 2002).

Mr. Lilly "is entitled to reasonable compensation, which means such sum as would reasonably compensate the victim both for bodily injuries and for pain and suffering. To that sum is added past, present, and future expenses reasonably necessary to the plaintiff's treatment." *Brumfiel v. United States*, 2005 U.S. Dist. LEXIS 43974, at *25 (S.D. Ind. Oct. 25, 2005) (internal citation and quotation marks omitted). However, Mr. Lilly is not entitled to recover for any alleged stress induced by or related to the litigation of this case. "It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages." *Stoleson v. United States*, 708 F.2d 1217, 1223 (7th Cir. 1983). Additionally, Mr. Lilly cannot recover punitive damages against the United States. *See* 28 U.S.C. § 2674.

The Seventh Circuit has explained that, in calculating damages for difficult-to-quantify harms such as pain, judges should not simply pluck figures "out of the air." *Arpin v. United States,*

521 F.3d 769, 776 (7th Cir.2008). Instead, the court should provide context to its decision by considering not only the circumstances of the individual plaintiff, but also awards made in similar cases. *Id.* Mr. Lilly requests $250.00 per day for emotional and physical pain and suffering. As recommended by the Seventh Circuit, the Court has "consult[ed] damages awards in comparable cases" to determine the reasonableness of the pain and suffering award in this case. *See Jutzi-Johnson v. United States*, 263 F.3d 753, 760 (7th Cir. 2001). See for example, *Larson v Mission Const. & Development, Inc.*, No. 27-CV-13-16801, 2014 WL 6854460 (Minn. Dist. Ct. Oct. 30, 2014) (plaintiff was struck by wood wall panel when the panel fell off the wall; plaintiff suffered a concussion, memory deficits, headaches, depression, and post-concussive syndrome; he was awarded more than $700,000.00 for pain and suffering as part of $1.25 million total award); *Momeni-Kuric v. Metropolitan Property and Casualty*, 3:18-197 (Aug. 2, 2019), 2019 IN JURY VERDICTS RPTR. LEXIS 138 (plaintiff was involved in car accident; plaintiff suffered a C5-6 disc injury which manifested as weakness in her dominant arm and hand; she was awarded $1,250,000.00 for pain and suffering as part of $1.7 million total award); *Grubbs v. United States*, 581 F. Supp. 536, 538 (N.D. Ind. 1984) (plaintiff contracted Guillain-Barre Syndrome from swine flu vaccination; plaintiff suffered physical and mental pain, distorted hands and fingers, and atrophy of the lower legs; she was awarded $400,000.00 for pain and suffering as part of $721,000.00 total award).

The Court finds the opinions of Dr. Pretorius and Dr. Greiner, concerning Mr. Lilly's inability to return to work are well-taken and supported. The parties stipulated, "The United States' expert, Dr. Ryan Gleason, does not dispute that Mr. Lilly is unable to work and has complaints of daily pain." ([Filing No. 84 at 7](Filing No. 84 at 7).) Dr. Gleason testified during trial that he did not believe Mr. Lilly to be disabled in contradiction to the stipulation undercuts some weight that the

Court affords to Dr. Gleason's testimony. Furthermore, Dr. Gleason did not review any of Mr. Lilly's prior treatment records, the actual scans about which he testified, or the current treatment records ([Filing No. 104 at 131](Filing No. 104 at 131)–38, 144, 150–52). However, Dr. Gleason, a neurologist, qualified as an expert in the field of diabetic peripheral neuropathy. The Court additionally notes that Dr. Pretorius conceded that Mr. Lilly's disability was caused by a number of factors, and not just the accident; and, Dr. Pretorius acknowledged that Mr. Lilly's renal failure also was caused by a number of factors.

The evidence shows–and the parties stipulate–that the United States' negligence proximately caused Mr. Lilly's two spinal fractures, mild traumatic brain injury, and post-concussive syndrome. The evidence shows that Mr. Lilly's hypertension, cerebral ischemia and diabetes were poorly controlled for some years before the fall, and aging can exacerbate theses chronic diseases. However, the evidence also shows that "Mr. Lilly had turned over a new leaf…he had gotten on his diet, had gotten off of insulin…he had lost 85 pounds… and was making a sincere effort" to improve his health. ([Filing No. 104 at 235](Filing No. 104 at 235)). The Court finds that some exacerbation of Mr. Lilly's diabetes, hypertension, hyperlipidemia, depression, and anxiety, and the development of hypogonadism were the result of the injury.

The Court concludes that the appropriate measure of damages to reasonably compensate Mr. Lilly for his injury is based upon Dr. Pretorius' original life expectancy for Mr. Lilly of five years (until he reaches the age of 72), which was based on the many medical conditions Mr. Lilly suffered and continues to suffer. The Court determines that Dr. Pretorius' revised life expectancy is not an effective baseline to measure damages because his testimony was conditional on treatment and medication and Mr. Lilly's medical compliance, which the Court concludes is too uncertain and speculative in this case. The Court further concludes that Mr. Lilly's arguments for

damages for skilled nursing care and a 3% annual raise for lost wages are also too speculative and not supported by sufficient evidence. Considering Mr. Lilly's past work history, gaps in employment earnings and earning capacity both before and after the accident, there is no evidence to support that he would work until age 76. In addition, Mr. Lilly did not present evidence to support a claim for loss of future earning capacity. There is evidence of life expectancy until age 72, but no evidence that he would be expected to work until that age. In contrast, there is evidence that his diabetic neuropathy would affect his ability to work as a truck driver for more than a "couple of years." Accordingly, the Court finds an award of lost wages for 292 weeks (from the time of the accident through August 2, 2019) to be more reasonable. Considering Mr. Lilly's circumstances, comparable awards for pain and suffering, and excluding damages for emotional distress brought on by the litigation, the Court finds $210.00 per day to be a reasonable scale for pain and suffering. Therefore, the Court concludes that Mr. Lilly is entitled to damages as follows:

a. Stipulated Past Medical Bills: $59,483.03 (for a period from December 2013 to May 2019 or 66 months, $901.26 per month)

b. Future Medical Bills: $14,420.16 (June 2019 to September 2020 when Mr. Lilly reaches the age of 72, 16 months, $901.26 per month)

c. Lost Wages: $306,600.00 (292 weeks at a weekly wage of $1,050.00, from the date of the injury through the date of trial)

d. Pain and Suffering: $519,330.00 ($210.00 per day for 2,473 days through age 72)

**Total Damages: $899,833.19.**

### III. <u>CONCLUSION</u>

For the reasons stated above, the Court concludes that Defendant United States of America is liable to Plaintiff Raymond Lilly on his claim of negligence, and Mr. Lilly is entitled to a damages award in the amount of $899,833.19. Final judgment consistent with this Entry will issue under separate order.

**SO ORDERED.**

Date: 3/10/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Nicholas Gene Brunette
REMINGER CO., LPA
nbrunette@reminger.com

Lyndsay I. Ignasiak
REMINGER CO., LPA
lignasiak@reminger.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov

Kelly Rota
UNITED STATES ATTORNEY'S OFFICE
kelly.rota@usdoj.gov